Stoffle v. Hilker, 189 Wis. 414.

STOFFLE, by guardian *ad litem,* Appellant, vs. HILKER and another, Respondents.

*February 11—March 9, 1926.*

*Automobiles: Collision with child: Failure to maintain proper look-out: Question for jury: Excessive damages.*

1. Evidence that the driver of an automobile did not see the plaintiff, a four-year-old child, until his automobile was three to four feet from her, that there was nothing to obstruct the driver's view, that had he kept a proper lookout he would have seen the child, and that if he had been going at the rate of speed he testified to he could have easily stopped the car in time to avoid the accident, clearly presented a jury question, if it did not establish negligence as a matter of law.  p. 418.

2. An award of $8,000 is *held* not excessive where the injuries consisted of a smashed foot and a fractured skull, the fracture necessitating the removal of a piece of bone, leaving an opening that would never heal over at the point of the most vital brain centers.  p. 418.

APPEAL from a judgment of the circuit court for Racine county: E. B. BELDEN, Circuit Judge. *Reversed, with directions.*

Personal injury.  This is an appeal from a judgment dismissing plaintiff's action and for costs to the defendants. There was a jury trial and a special verdict favorable to the plaintiff.  The answers in the verdict finding the defendants guilty of negligence were set aside by the circuit court, and answers substituted holding the defendants free from negligence.  From the judgment the plaintiff appeals.

For the appellant there were briefs by *John T. Booz* of Chicago and *McGovern, Lyons, Curtis, Devos & Reiss* of Milwaukee, and oral argument by *F. E. McGovern.*

For the respondents there was a brief by *Thompson, Harvey & Monk,* attorneys, and *John B. Simmons,* of counsel, all of Racine, and a separate brief by *John B. Simmons;* and the cause was argued orally by *Mr. Fulton Thompson* and *Mr. Simmons.*

CROWNHART, J.   Briefly, the evidence in this case fairly shows the following situation: On September 30, 1922, the defendant *Fred C. Hilker* was riding in his Mitchell seven-passenger car, going east on Irving Park boulevard in the city of Chicago, across a bridge over the Chicago river, on a bright, clear day, at about 9:45 a. m.   The car was driven by his son, the defendant *James Hilker,* who was then seventeen years of age.   In the front seat with *James* was a younger brother, sitting in the middle, and a young man, about seventeen years of age, sitting on the right-hand side. In the middle seats, back of the front seat, sat two girls, each about fifteen years of age, and in the back seat with the defendant *Fred Hilker* was his son Harold, aged thirteen.

The boulevard had sidewalks on each side and was considerably wider than the bridge, but narrowed to the width of the bridge as it approached the bridge.   The bridge was 54.30 feet wide from outside rail to outside rail.   On the north side was a walk about six inches higher than the floor of the bridge and about 8.95 feet wide.   To the south of this walk was a driveway 10.87 feet wide, for west-bound traffic; then two street-car rails, 4.71 feet apart; then a space between street-car rails of 5.50 feet; another set of street-car rails 4.71 feet apart; then a driveway for east-bound traffic, 10.48 feet wide, and then the south walk for pedestrians, about 9.05 feet wide.   The bridge was 184.8 feet long, and formed an oval or bow, being two feet higher in the center than at either end.

Six little girls, ranging from three to nine years, went on to the bridge from the north walk at the west end, and along the north walk on the bridge until they came within eight or ten feet of the center.   There they started to go across from the north side of the bridge to the south side.   As they started to step down from the walk to the bridge floor, they noticed a Ford coupé coming from the east and stepped back on to the walk and waited for it to pass by.   As soon

as it passed them they started to go across, either at a fast walk or running. Four children got safely across on to the south walk and stood looking down upon the river. Two children were behind; one, Ruth Larson, seven years old, was leading the infant plaintiff, about four years old, by the hand. As these two reached the south traffic way over the bridge they noticed the defendant's automobile coming toward them. The older girl drew back to escape, while the younger child broke away and went forward. The defendant's car struck the younger girl, threw her down, rolled her over and over, passed over her body, and stopped so that the body of the child was partially between the hind wheels of the car and partially back of the axle. The evidence differs as to just what part of the car hit the child. She was picked up and taken to the hospital. She had a badly smashed foot and fractured skull, the fracture line extending from the temple clear around the head, with a depressed triangular fracture of the skull near the left temple.

The plaintiff claimed that the defendant driver was guilty of negligence in that he was driving his car at more than fifteen miles an hour, and in that he failed to keep a proper lookout. The jury found that there was a failure on the part of the defendant *James Hilker* to exercise ordinary care in driving or operating the automobile at or immediately before the accident, which failure was a proximate cause of the injury to the plaintiff, and it found that there was a failure to exercise ordinary care on the part of the defendant *James Hilker* in respect to keeping a proper lookout for pedestrians while driving the automobile across the bridge at or immediately before the accident, which failure was a proximate cause of the accident. If the evidence sustains these findings of the jury, or either of them, the plaintiff was entitled to judgment.

Neither the driver nor any of the passengers in the car saw any of these girls crossing the bridge until they saw the injured child about three or four feet in front of the

automobile.   The driver of the automobile, the young man sitting in the seat with him, and the driver of the Ford coupé, who passed in front of the little girls on the north side, all testified that the defendant's automobile was going at about twelve miles an hour, while an equally credible witness, coming across the bridge from the east going west, and who was but a short distance ahead of the automobile, testified that before the accident, while on the bridge, the auto was going twenty-five or thirty miles an hour, but slowed down just before it struck the child.   Plainly, the jury might find from this testimony and from the fact that the automobile was going up an incline and that it struck the child such a severe blow as to result in a bad fracture of the head and passed over the child's body before stopping, that the car was going in excess of fifteen miles an hour.

There is no question about these six children crossing the bridge,—four of them safely, and two of them just too late to get ahead of the automobile.   There is no question but that there was nothing to obstruct the driver's view of the children as they crossed all the way from the north to the south walk, and that he could have seen these children had he looked.   The driver testified that he did not see any of the children until he saw the injured child immediately in front of his automobile.   He did not see the four children that had safely passed in front of his car, nor the older child who backed away to escape injury.   The general situation on the bridge was established by all the witnesses.   There was some difference as to the amount of traffic on the bridge, but all agreed that there was nothing to obstruct the driver's view of the girls as they crossed the bridge.   So on this question, assuming that the driver was going at the speed that he testified to and which the defendants contend for, that is, twelve miles an hour, the evidence establishes without substantial dispute that the driver did not keep a proper lookout.   Had he kept a proper lookout he would have seen the children much sooner than he did, and had he been going

at the speed he testified, he could easily have stopped his car in time to avoid the accident, or he could have signaled with his horn in time to have warned the child.  The driver testified that he did "tap" his horn, but it was not until the automobile was within three feet of the child and too late to be effective for any purpose.

The evidence was such that the trial court erred in setting aside the verdict finding defendants guilty of negligence proximately causing the accident, by reason of failure to keep a proper lookout.  The testimony on this proposition clearly presented a jury question, if it did not establish defendants' negligence as a matter of law.  This being so, we need not consider the other charge of negligence.

The respondents further contend that the verdict is excessive.  The verdict was in favor of the child for $8,000.  The surgeon who treated her testified that there was a V-shaped depressed fracture in the left temporal region from which a piece of bone was removed, leaving an opening that would never heal over.  At the time of the trial it was L-shaped, about an inch wide and three inches long at the base.  He testified that at this point are some of the most vital brain centers, the motor area there being very important; that even a moderate blow or impact at this point might at any time cause paralysis or instantaneous death; that the only protection the brain has in this part of the child's skull is the skin and some scar tissue; that it may result in Jacksonian epilepsy or cerebral hernia.  In addition she is exposed to the danger of nerve irritation and resulting spasms more or less chronic.  The father testified that the child's disposition and temperament were changed after the accident; that whereas she was bright and cheerful before the accident that now "sometimes you can't get a word out of her as she sits there with hardly any life in her and does not seem to be as lively as before she was hit."  There was no contradictory testimony introduced by the defendants.  While the verdict is large, it is amply sustained by the evidence.  Here is a child, injured when about four

years of age, so that her whole future life is to be very seriously affected. It is within the reasonable probabilities that this injury may result in a permanent total disability, which would justify a verdict much larger than the one in question.

*By the Court.*—The judgment of the ·circuit court is reversed, with directions to the circuit court to reinstate the answers·of the jury in the special verdict to the third and fourth questions, and to enter judgment thereon in. favor of the plaintiff, in accordance with this opinion.