**William R. JOHNSON, Plaintiff–Appellant,**

v.

**BEATRICE FOODS CO., Defendant–Appellee.**

**No. 89–6101.**

United States Court of Appeals, Tenth Circuit.

Dec. 10, 1990.

Clell I. Cunningham, III (Janice M. Dansby, with him, on the briefs), Miller, Dollarhide, Dawson & Shaw, Oklahoma City, Okl., for plaintiff-appellant.

Debra G. Houde (K. Nicholas Wilson, on the brief) Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, Okl., and C.R. Gangemi, Jr., David B. Love, Winston & Strawn, Chicago, Ill., for defendant-appellee.

Before BALDOCK, BARRETT and EBEL, Circuit Judges.

BARRETT, Senior Circuit Judge.

William R. Johnson ("Johnson") appeals from the district court's entry of summary judgment in favor of his former employer Beatrice Foods ("Beatrice") on his claim of intentional infliction of emotional distress.[1] Jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332.

Johnson contends that the district court erred in finding that: (1) the portions of his claim relating to wrongful suspension and discipline by Beatrice were pre-empted by § 301 of the Labor–Management Relations Act (LMRA), 29 U.S.C. § 185(a); and (2) his allegations, even if true, did not allege facts sufficiently outrageous to sustain a cause of action under Oklahoma state law for intentional infliction of emotional dis-

---

**1.** The tort of intentional infliction of emotional distress is also known as the tort of outrage in the State of Oklahoma. *See Eddy v. Brown,* 715 P.2d 74, 75 n. 1 (Okla.1986).

tress. Because we hold that Johnson's claim in its entirety was pre-empted by § 301, we affirm the district court's dismissal.

### I.

Johnson was employed by Meadow Gold, a division of Beatrice, as a route salesperson from July, 1979, until his resignation in September, 1985. During his employment, he was responsible for delivering Meadow Gold products to customers in the Oklahoma City area. Johnson was a member of the Teamsters Union, and was union steward for the Oklahoma City facility between 1984 and 1985.

The terms of Johnson's employment were governed by a collective bargaining agreement ("CBA") negotiated between the Teamsters and Beatrice. The CBA allowed Beatrice to terminate an employee only upon "just cause;" required Beatrice to give a warning notice before discharging an employee except for certain specified infractions; permitted Beatrice to suspend an employee for "serious violations of the [CBA];" prohibited discrimination against any employee because of union membership or activities; and set forth a designated grievance and arbitration procedure so that employees could grieve any discharge, suspension, or general dispute.

During the two years that he was union steward, Johnson allegedly was harassed by Richard Gleichman, the Oklahoma City facility manager. According to Johnson, Gleichman hated him and wanted to get rid of him. Paul Plumlee, the Teamsters' Oklahoma City representative, received more telephone calls per capita growing out of problems between Gleichman and Johnson than he ever received from the other plants he represented.

On February 29, 1984, Johnson went to a physician for treatment of stress. He was experiencing memory lapses, crying spells, severe headaches and chest pains. The physician told Johnson to stay away from work for a month. That day, Johnson told Joe Robbins, one of Meadow Gold's supervisors, that he would be on sick leave for two to four weeks. Johnson returned to work on April 16, 1984, pursuant to a re-

lease from his physician that he was "medically able to drive a truck." (R., Vol. IV, Tab J at p. 6). He remained with Meadow Gold and Beatrice until September, 1985, at which time he resigned and took another job that paid less. According to Johnson, he would have resigned even if he had not had another position because of the pressure at Meadow Gold.

During the two-year period that he was union steward, Johnson filed numerous grievances in accordance with the CBA to challenge many of Gleichman's actions against him:

1. A grievance filed February 29, 1984, regarding a two-day suspension for getting his route out of sequence was settled by paying Johnson two days' pay;

2. Two grievances filed March 30, 1984, regarding Gleichman discharging Johnson for taking sick leave were settled by reinstating Johnson and paying him lost wages and sick pay;

3. A grievance filed May 4, 1984, regarding three days of work which Johnson lost before he was permitted to return to work after his sick leave was dropped as part of the settlement described in paragraph 2, *supra;*

4. A grievance filed May 4, 1984, regarding the reassignment of Johnson's route to another driver during the period of Johnson's sick leave was withdrawn by Johnson when Gleichman added more stops to the route, making the route more difficult to complete. Gleichman removed the extra stops from the route after Johnson withdrew his grievance;

5. Two grievances filed May 4 and June 27, 1984, regarding discrimination and harrassment of Johnson were settled by Beatrice agreeing not to engage in any such discrimination or harassment in the future. The settlement of this grievance came in September, 1984, and also served as settlement of a discrimination suit that Johnson filed in September with the National Labor Relations Board; and

6. Two grievances filed April 16, 1985, regarding a one-day suspension which Johnson received and the reassignment of a customer on Johnson's route to an

independent distributor apparently were never resolved.

Johnson voluntarily chose not to challenge any of Gleichman's other actions through the grievance procedure. According to Plumlee, the problems between Gleichman and Johnson were not arbitrable, and remained unresolved even after Beatrice agreed not to engage in future harassment or discrimination.

Prior to the instant action, Johnson filed suit against Beatrice in federal court under § 301 of the LMRA, claiming that Beatrice discriminated against and harassed him because of his union steward position. Johnson alleged that Beatrice's conduct constituted a breach of the CBA. Johnson then filed a proposed amended complaint stating that Beatrice's conduct created a second cause of action for intentional infliction of emotional distress.

In April, 1987, the district court granted Beatrice's motion to dismiss the complaint. The court found that Johnson had failed to state a cause of action against Beatrice under § 301 because he did not allege that the Teamsters had breached its duty of fair representation to Johnson. The court reasoned that Johnson's claim that the Teamsters were unable to secure adequate recompense for his damages was insufficient to constitute a breach of that duty. The court then determined that it had no pendent jurisdiction over the state claim of intentional infliction of emotional distress, and accordingly dismissed the entire complaint.

In December, 1986, before the dismissal of his suit in federal court, Johnson filed the instant action against Beatrice in the Oklahoma County state district court. He alleged a single theory of recovery for intentional infliction of emotional distress under Oklahoma common law. Specifically, he claimed that "Dick Gleichman, Plaintiff's supervisor, instituted a campaign of intentional discrimination and harassment with the express purposes of inflicting emotional distress upon Plaintiff." (R., Vol. I, Tab G at p. 1). Beatrice removed the action to federal district court, citing diversity as the basis for jurisdiction. Beatrice then moved for summary judgment.

In its response to Beatrice's motion, Johnson alleged 28 specific incidents involving Gleichman between 1984 and 1985 which he contended constituted intentional infliction of emotional distress. These incidents are summarized as follows:

1. Gleichman yelled at and verbally abused Johnson on an almost daily basis. He usually pounded the desk, beat the walls and stomped the floor while yelling;

2. Gleichman frequently called Johnson names in the presence of co-workers;

3. Gleichman had Johnson followed around by at least two co-workers. He told one of the co-workers to ignore theft by two other drivers and to devote his time exclusively to getting rid of Johnson;

4. Gleichman encouraged another co-worker of Johnson in early 1984 to shun Johnson;

5. Gleichman publicly ridiculed Johnson on February 14, 1984, by placing Johnson's name on a mannequin and claiming that Johnson had the most bad product on his route even though Johnson had been on vacation. He then laughed and joked with Johnson's co-workers about the incident;

6. Gleichman planted bad product on Johnson's route on February 22, 1984, and then yelled and screamed at Johnson about the bad product. He placed a written warning in Johnson's personnel file over the incident;

7. Gleichman frequently rearranged Johnson's stops and changed his starting time to make it more difficult for Johnson to run his route. When Johnson got his route out of sequence under these conditions on February 24, 1984, Gleichman fired him, and then changed the firing to a two-day suspension;

8. Gleichman unjustly fired Johnson on March 6, 1984, for taking sick leave because of emotional distress;

9. Gleichman often threatened in March, 1984 to shut down the Oklahoma City plant if Johnson got his job back;

10. Gleichman delighted in the fact that Johnson's wife was leaving him in August, 1984. He thought it was funny that Johnson would endure financial hardship because of the divorce;

11. Gleichman persuaded Mrs. Johnson, while the divorce was pending, to testify against her husband in his lawsuit against Beatrice. Then he bragged about it;

12. Gleichman suspended Johnson in April, 1985 for leaving bad product with a restaurant when he knew that the product was left by a substitute driver. The substitute driver was given only a verbal warning; and

13. Gleichman made it impossible for Johnson to properly service a customer's account, and then yelled at Johnson when Beatrice lost the account.

In February, 1989, the district court entered summary judgment against Johnson. Initially, the court found that the portions of Johnson's claim relating to wrongful suspension and discipline by Beatrice were pre-empted by § 301 of the LMRA. The court reasoned that, under *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988), state law claims are pre-empted by § 301 when the application of state law requires the interpretation of a CBA. Specifically, the court found that "[d]iscipline is a subject addressed by the [CBA], and [this court] could not determine whether [Beatrice's] conduct was outrageous, without determining whether the suspension or discipline was allowed under the [CBA]." (R., Vol. I, Tab 82 at p. 2.) The court also found that Johnson's allegations, even if not pre-empted, did not allege facts sufficiently outrageous to sustain a cause of action under Oklahoma state law for intentional infliction of emotional distress.

This timely appeal followed.

## II.

"We will affirm a grant of summary judgment if it is clear that there are no genuine issues of material fact and the defendants are entitled to judgment as a matter of law." *Willner v. Budig,* 848 F.2d 1032, 1033–34 (10th Cir.1988). We will first consider whether the district court was correct in finding that § 301 of the LMRA pre-empted Johnson's claim.

■ Section 301 states: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a). In 1957, the Supreme Court held that § 301 gave federal courts jurisdiction over controversies involving CBA's. *Textile Workers v. Lincoln Mills of Alabama,* 353 U.S. 448, 451, 77 S.Ct. 912, 915, 1 L.Ed.2d 972 (1957). While the Court has given the states concurrent jurisdiction over § 301 claims, *Charles Dowd Box Co. v. Courtney,* 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962), it has expressly held that federal, and not state, law must be used in adjudicating these claims. *Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). Indeed, "in enacting § 301 Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules." *Id.* at 104, 82 S.Ct. at 577. (For history of pre-emptive scope of § 301, *see Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 208–10, 105 S.Ct. 1904, 1909–11, 85 L.Ed.2d 206 (1985)).

In 1985, the Supreme Court determined that the pre-emptive effect of § 301 must extend beyond suits alleging contract violations. *Allis–Chalmers,* 471 U.S. at 210, 105 S.Ct. at 1910. In *Allis–Chalmers,* an employee sued his employer under a state tort remedy for bad faith handling of an insurance claim. Under state law, this tort claim required that the duty of the insurer in handling claims be " 'ascertained from a consideration of the contract itself.' " *Id.* at 216, 105 S.Ct. at 1914 (*quoting Hilker v. Western Automobile Ins. Co.,* 204 Wis. 1, 16, 235 N.W. 413, 415 (1931)). In his complaint, the employee claimed his employer intentionally, contemptuously, and repeatedly failed to make disability payments

under the negotiated disability plan. *Allis–Chalmers*, 471 U.S. at 206, 105 S.Ct. at 1908. He alleged that as a result of these bad-faith actions he incurred debts, emotional distress, physical impairment, and pain and suffering. *Id.*

In determining that the state tort claim was pre-empted by § 301, the Court set forth this basic principle:

> The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort. Any other result would elevate form over substance and allow parties to evade the requirements of § 301 by relabeling their contract claims as claims for tortious breach of contract.

*Allis–Chalmers*, 471 U.S. at 211, 105 S.Ct. at 1911. The Court determined it must focus on whether the tort "confers nonnegotiable state-law rights ... independent of any right established by contract, or, instead, whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract." *Id.* at 213, 105 S.Ct. at 1912. The Court concluded that § 301 pre-empts any state law claims that are "substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract...." *Id.* at 220, 105 S.Ct. at 1916.

Since under state law "[t]he parties' agreement as to the manner in which a benefit claim would be handled [would] necessarily [have been] relevant to any allegation that the claim was handled in a dilatory manner," *Id.* at 218, 105 S.Ct. at 1915, the Court ruled the claim was pre-empted by § 301.

In making its holding, the Court noted that the CBA may very well contain not only explicit but implied rights: "The assumption that the labor contract creates no implied rights is not one that state law may make. Rather, it is a question of federal contract interpretation...." *Id.* at 215, 105 S.Ct. at 1913. The Court explained:

> Since nearly any alleged willful breach of contract can be restated as a tort claim for breach of a good-faith obligation under a contract, the arbitrator's role in every case could be bypassed easily if § 301 is not understood to pre-empt such claims. Claims involving vacation or overtime pay, work assignment, unfair discharge—*in short, the whole range of disputes traditionally resolved through arbitration*—could be brought in the first instance in state court by a complaint in tort rather than in contract. A rule that permitted an individual to side-step available grievance procedures would cause arbitration to lose most of its effectiveness ... as well as eviscerate a central tenet of federal labor-contract law under § 301 that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance. (Emphasis supplied).

*Id.* at 219–20, 105 S.Ct. at 1915.[2] Indeed, this circuit has noted that "[p]laintiffs ... often [attempt] to avoid federal jurisdiction under § 301 by framing their complaints in terms of such diverse state law theories as

---

2. The Supreme Court has found the *Allis–Chalmers* test to pre-empt two other state tort actions: *Electrical Workers v. Hechler*, 481 U.S. 851, 107 S.Ct. 2161, 95 L.Ed.2d 791 (1987) and *United Steelworkers v. Rawson*, —— U.S. ——, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990). In *Hechler*, the Court held that an individual employee's state law tort suit against her union for breach of the union's duty of care to provide the employee with a safe workplace must be pre-empted by § 301, since the nature and scope of

the duty of care arose not from the common law but from the CBA. In *Rawson*, the Court held that a state law wrongful death suit brought by the survivors of deceased miners for breach of the union's duty of care to inspect the safety of mines must be pre-empted by § 301 because the state court had held that the provisions of the CBA, and not the state law, determined the nature and scope of the union's duty to inspect.

wrongful discharge, *intentional infliction of emotional distress*, conspiracy, and misrepresentation" and that such attempts will not succeed. *United Assoc. of Journeymen and Apprentices of the Plumbing and Pipefitting Industry v. Bechtel Power Corp.*, 834 F.2d 884, 887–88 (10th Cir.1987), *cert. denied*, 486 U.S. 1055, 108 S.Ct. 2822, 100 L.Ed.2d 923 (1988) (emphasis supplied).

In our view, the holdings in *Allis–Chalmers* and *Bechtel Power* are consistent with the "Steelworkers Trilogy" articulated in *United Steelworkers v. Enterprise Wheel & Car Corp.* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) and *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). In those cases, the Supreme Court stated a broad policy favoring arbitration under a collective bargaining agreement. The Court held that, interpretive of a collective bargaining agreement, (1) if the contract contains an arbitration clause, the dispute, whether or not it involves the interpretation of the contract, is subject to arbitration in the absence of specific language to the contrary, (2) if it is unclear whether a company has agreed to arbitrate a specific issue, doubts must be resolved in favor of arbitration, and (3) the arbitrator is not confined solely to the language of the contract, but may apply the common law of the shop.

We hold that Johnson's claim for intentional infliction of emotional distress closely parallels the bad faith claim in *Allis–Chalmers*, and is thus pre-empted by § 301. Each of Johnson's allegations directly relates to either explicit or implied rights derived from the CBA, just as the bad faith tort claim in *Allis–Chalmers* did. Johnson's complaint pertains to the manner in which discipline was carried out, just as the employee in *Allis–Chalmers* complained about the manner in which his insurance claim was handled. Furthermore, Johnson could have used the CBA grievance procedure for any of the allegations in his complaint since all the allegations involved either a suspension, discharge or work-related dispute.[3]

Moreover, Oklahoma has held that a claim for intentional infliction of emotional distress "should not be considered in a sterile setting, detached from the milieu in which it took place." *Eddy v. Brown*, 715 P.2d 74, 77 (Okla.1986) (footnote omitted). We interpret the Oklahoma law to mean that all aspects of Johnson's employment, including the terms of the CBA, must be considered when evaluating whether Beatrice's conduct was outrageous. We therefore agree with the district court that it cannot be determined whether Beatrice's conduct was outrageous without determining whether the conduct was allowed under the CBA. Indeed, "[a]ctions that the [CBA] permits might be deemed reasonable in virtue of the fact that the CBA permits them." *Miller v. AT & T Network Systems.* 850 F.2d 543, 550 (9th Cir.1988). We disagree with the district court only to the extent that it limits its pre-emption to suspensions or disciplinary actions; since the CBA also allows "disputes" to be grieved, we would hold that all of Johnson's allegations are pre-empted.

Johnson urges us to find under *Lingle, supra*, that his action is not pre-empted. *Lingle* is the only case in which the Supreme Court has applied the *Allis–Chalmers* reasoning and found that a state tort claim was not pre-empted by § 301. In that case, an employee notified her employer that she had been injured in the course of her employment and requested compensation for her medical expenses pursuant to the Illinois Worker's Compensation Act. Her employer discharged her on the ground that she had filed a false worker's compensation claim, while the employee maintained she was discharged for exercising her worker's compensation rights. The union representing the employee filed a grievance pursuant to the CBA which protected employees from discharge except for "just cause." The employee then filed suit

---

**3.** Johnson's only claim of outrageous behavior that arguably was not work-related was that Gleichman "delighted in the fact that Johnson's wife was leaving him." Johnson does not allege, nor will we hold, that this allegation in and of itself is sufficient to sustain a cause of action for intentional infliction of emotional distress under Oklahoma law.

for retaliatory discharge under the Illinois Act, which specifically permits recovery of compensatory and punitive damages to employees who are discharged for filing worker's compensation claims.

We hold *Lingle* to be inapposite here. The Illinois Worker's Compensation Act creates an independent state cause of action because it creates an independent method of review. The facts alleged by the employee in *Lingle* fit specifically into the Act's prohibition of firing an employee for exercising rights under the Act. Such a statute is not pre-empted by § 301 even though the CBA grievance procedure would review the same facts under a more general claim of unjust discharge.[4] *Lingle*, 486 U.S. at 408, 108 S.Ct. at 1882. In contrast, Oklahoma's tort for intentional infliction of emotional distress does not create an independent method of measuring when an employer's work-related conduct is outrageous.

Johnson also urges us to apply the reasoning of *Farmer v. United Brotherhood of Carpenters and Joiners*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977). In that case, the Supreme Court considered pre-emption of state tort claims under the National Labor Relations Act. However, *Allis–Chalmers* and *Lingle*, not *Farmer*, control § 301 pre-emption and we decline to hold otherwise.

We note that other circuits have reached varying results when applying the *Allis–Chalmers* and *Lingle* holdings to state tort claims for intentional infliction of emotional distress. *Compare Brown v. Southwestern Bell Telephone Co.*, 901 F.2d 1250, 1256 (5th Cir.1990) (emotional distress claim pre-empted because claim actually based on whether employer could discharge employee under terms of contract); *Harris v. Alumax Mill Products, Inc.*, 897 F.2d 400, 403 (9th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 102, 112 L.Ed.2d 73 (1990)

(emotional distress claim arising out of application of attendance policy pre-empted because "determination of both the scope of Alumax's control over the attendance policy and any consequences flowing from a violation of the policy are dependent upon an analysis of the [CBA]"); *Douglas v. American Information Technologies Corp.*, 877 F.2d 565, 573 (7th Cir.1989) (emotional distress claim pre-empted where employee complains that employer unfairly applied terms and conditions of CBA); *Johnson v. Anheuser Busch, Inc.*, 876 F.2d 620, 624 (8th Cir.1989) (claim pre-empted where claim arises out of employee's discharge and investigation leading up to discharge because determination of merits requires review of whether discharge was warranted under CBA), *with Hanks v. General Motors Corp.*, 906 F.2d 341 (8th Cir.1990) (emotional distress claim based on employee's re-assignment to work with supervisor accused of molesting employee's daughter is not pre-empted because claim does not depend on interpretation of CBA terms); *Krashna v. Oliver Realty, Inc.*, 895 F.2d 111, 114 (3d Cir.1990) (emotional distress claim based on harassment and discharge is "clearly outside the scope of the [CBA] and § 301"); *O'Shea v. Detroit News*, 887 F.2d 683, 687 (6th Cir.1989) (claim based on employee's assignment to work undesirable night shift not pre-empted because CBA is irrelevant. Employer could have tortiously caused employee emotional distress without violating the contract); *Keehr v. Consolidated Freightways of Delaware, Inc.*, 825 F.2d 133, 138 n. 6 (7th Cir.1987) (emotional distress claim based on supervisor's baiting of employee in order to provoke employee into throwing a punch and giving supervisor reason to discharge employee is not pre-empted because claim "revolved around conduct by ... employer that is not even arguably sanctioned by the labor contract."). While we recognize these conflicting results, we

---

**4.** Our interpretation of *Lingle* today is consistent with our holding in *Marshall v. TRW, Inc., Reda Pump Division*, 900 F.2d 1517 (10th Cir.1990). In *Marshall*, an employee filed suit for retaliatory discharge under a statute similar to the statute in *Lingle*. As in *Lingle*, the employee claimed that he was fired for filing a worker's compensation claim, an action specifically pro-

hibited by the statute. The employer claimed that it fired the employee for violating the CBA. Relying on *Lingle*, we held that § 301 did not pre-empt this statutory claim because there was no need to interpret the CBA when evaluating the employer's motive for discharging the employee.

**1022**

interpret *Allis–Chalmers* and *Lingle* as necessitating pre-emption in this case.

We recognize that, by limiting Johnson to the CBA, we eliminate some of the choices he would have had otherwise. Under an arbitrable claim subject to a collective bargaining agreement, the common remedies are reinstatement and back pay, whereas an award of punitive damages is sometimes permitted as a state law tort remedy. State court proceedings are usually heard by juries, who may be less sympathetic to an employer than an arbitrator. But if we allow Johnson to bring his contract-sounding complaint in tort and "sidestep available grievance procedures," *Allis–Chalmers, supra,* so that he can take advantage of these options, we controvert congressional intent to have "doctrines of federal labor law uniformly to prevail over inconsistent local rules." *Lucas Flour, supra.*

Because we hold that Johnson's claim is pre-empted by § 301, we need not consider whether his allegations were sufficient to maintain a claim of intentional infliction of emotional distress under Oklahoma law.

We AFFIRM.